### Dennis LYONS

v.

### CITY OF LEWISTON et al.

Supreme Judicial Court of Maine.

Argued June 7, 1995.

Decided Oct. 19, 1995.

Kim Matthews (orally), Portland, for Plaintiff.

William R. Fisher (orally), John J. Wall, III, Monaghan, Leahy, Hochadel & Libby, Portland, Edward R. Benjamin, Jr. (orally), Daniel Rapaport, Preti, Flaherty, Beliveau & Pachios, Bangor, for Defendants.

Before WATHEN, C.J., and ROBERTS, GLASSMAN, CLIFFORD, RUDMAN, DANA and LIPEZ, JJ.

DANA, Justice.

The plaintiff, Dennis Lyons, and the several defendants appeal the judgment entered in the Superior Court (Cumberland County, *Brennan, J.*) denying their cross motions for summary judgments. The defendants are the City of Lewiston, the County of Androscoggin, Lewiston police officers Lee Jones and Edward Carpenter, and Androscoggin

County Deputy Sheriff Daniel McGinley.[1] Lyons also appeals the granting of a summary judgment in favor of defendants Jones, McGinley, the City of Lewiston, and the County of Androscoggin as to Lyons's state tort claims. We affirm the judgment.

## I.

This lawsuit arises out of events that occurred when former President George Bush visited Lewiston High School in September 1991. The Secret Service established a "no access area" to restrict access to the high school and the presidential motorcade viewing area. Lyons and 12 to 20 members of an organization, ACT–UP—Portland ("ACT–UP"), gathered in Lewiston on the morning of the presidential visit to protest certain policies of the Bush Administration. They proceeded along East Avenue toward Lewiston High School and the motorcade viewing area. Lewiston police officers, including Jones and Carpenter, and Androscoggin County deputy sheriffs advised Lyons and the others that a roped off area, 727 feet from the closest point of the motorcade route, had been designated as a "demonstrator area," and that they would not be allowed to proceed further. Members of the general public and other demonstrators, however, were allowed to proceed by foot toward the high school and the motorcade viewing area.[2]

Jones and Carpenter told Lyons and other members of ACT–UP that they would be arrested if they left the "demonstrator area" and proceeded toward the motorcade route. When Lyons, who wanted his protest to be visible to the Presidential motorcade, the general public, and the media filming the motorcade, continued along East Avenue for about five to ten yards, Jones arrested him and McGinley placed and held him in a waiting school bus. Following the advice of the Androscoggin County District Attorney, Sheriff's Department personnel transferred Lyons to the Androscoggin County Jail and

charged him with criminal trespass. Prior to any court action, the charges were dropped.

Lyons filed an amended complaint in June 1992 containing eight counts and requesting nominal, compensatory, and punitive damages, as well as injunctive and declaratory relief. Counts I and IV assert claims brought pursuant to 42 U.S.C. § 1983 (1994) and 5 M.R.S.A. § 4682 (Supp.1994) that all the defendants violated Lyons's constitutional rights by placing unreasonable restrictions on his participation in the protest against the Bush Administration's AIDS policies. Count II alleges a conspiracy to deprive Lyons of his constitutional rights and count III alleges a violation of rights secured by Article I, §§ 4 and 15 of the Constitution of the State of Maine. Counts V–VIII allege violations of state tort law.

Lyons filed a motion for a partial summary judgment in September 1993 against all the defendants on the issue of liability. The defendants opposed Lyons's motion and moved for a summary judgment on all counts. In November 1994 the court denied Lyons's motion for a partial summary judgment on counts I and IV. Counts II and III were dismissed with Lyons's acquiescence. The court granted the defendants' motions for a summary judgment with respect to counts V–VIII, for which the defendants asserted absolute immunity pursuant to the Maine Tort Claims Act, 14 M.R.S.A. §§ 8101–8118 (1980 and Supp.1994). The court also denied the defendants' motion for a summary judgment with respect to counts I and IV, in which they asserted qualified immunity from liability. In addition, the court declared that the municipalities were immune from punitive damages with respect to the section 1983 claim, but it reserved ruling on Lyons's section 1983 punitive damages claims against the individual defendants. These appeals and cross-appeals followed.

---

1. The Superior Court dismissed the claims against Maine State Police Chief Colonel Demers in an order dated November 30, 1992.

2. McGinley reported that "we were told that a group of ACT–UP demonstrators were to be placed in a designated area." He also reported

that "some of the demonstrators ... appeared not to cause any threats so they were not bothered. Some of the demonstrators and protestors went around the block and blended into the crowd."

## II.

We first consider whether the court erred in denying a summary judgment in favor of the individual defendants based on their defense of a qualified immunity. We note that the denial of a defendant's motion for a summary judgment based on a qualified immunity is immediately appealable pursuant to the collateral order exception to the final judgment rule. *See Ryan v. City of Augusta*, 622 A.2d 74, 75 (Me.1993) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 524–26, 105 S.Ct. 2806, 2814–15, 86 L.Ed.2d 411 (1985)). A summary judgment is appropriate when the record reveals no genuine issues of material fact and any party is entitled to a judgment as a matter of law. "We review the Superior Court's decision for errors of law, viewing the record in the light most favorable to the non-moving party." *Diversified Foods, Inc. v. First Nat'l Bank of Boston*, 605 A.2d 609, 612 (Me.1992).

A plaintiff may maintain a section 1983 claim[3] against governmental employees only if they are not entitled to a qualified immunity. Pursuant to this doctrine, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). "The two-part test for denial of qualified immunity is (1) whether the plaintiff's constitutional rights were violated, and (2) whether those rights were so clearly established that reasonable defendants would have known that their specific actions transgressed those rights." *Creamer v. Sceviour*, 652 A.2d 110, 113 (Me. 1995); *see also Harlow*, 457 U.S. at 819, 102 S.Ct. at 2738 ("Where an official could be expected to know that certain conduct would violate statutory or constitutional rights, he should be made to hesitate; and a person who suffers injury caused by such conduct

may have a cause of action."); *Amsden v. Moran*, 904 F.2d 748, 752 (1st Cir.1990), *cert. denied*, 498 U.S. 1041, 111 S.Ct. 713, 112 L.Ed.2d 702 (1991) ("[W]e must determine whether defendants reasonably should have comprehended that their specific actions transgressed those 'clearly established' rights."). " 'Clearly established' means that the unlawfulness of the act must be apparent in light of pre-existing law, not merely a ' "general declaration of the legal right allegedly violated." ' " *Creamer*, 652 A.2d at 113, (quoting *Maguire v. Municipality of Old Orchard Beach*, 783 F.Supp. 1475, 1480 (D.Me. 1992) (citations omitted).) "This latter inquiry is objective and is concerned with the reasonableness of the defendant's conduct, not whether the plaintiff's rights were actually violated." *Creamer*, 652 A.2d at 113 (citing *Amsden*, 904 F.2d at 751–52). As we have recently stated,

> The application of the qualified immunity doctrine turns on the "objective legal reasonableness" of the official's action viewed in light of the "clearly established" legal rules at the time the action was taken. In order to determine that a right is clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."

*Parsons v. Wright*, 649 A.2d 1108, 1111 (Me. 1994) (quoting *Ryan v. City of Augusta*, 622 A.2d 74, 76 (Me.1993) (citations omitted)). Stated affirmatively, a public official is entitled to qualified immunity if he can establish either that 1) he did not violate the plaintiff's constitutional rights; or 2) given the state of the law a reasonable official would not have understood that he was doing so.

The qualified immunity analysis begins with the identification of the right at issue and proceeds to place that right in historical perspective. What the law was and whether it was clearly established at the time of the alleged violation are questions of

---

**3.** 42 U.S.C.A. § 1983 (1994) states in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, or any State or Territory or the District of Columbia, subjects, or causes to be subjected,

any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law....

law. *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738. In his complaint, Lyons states that his and ACT–UP's purpose was to assemble and petition the federal and state governments for redress of grievances and to protest certain policies of the Bush Administration, including, but not limited to, the lack of a national policy on AIDS education. The government may validly restrict such expressive activity if that restriction is content neutral, narrowly tailored to meet a significant governmental interest, and allows for ample alternate channels for communication. *Regan v. Time, Inc.,* 468 U.S. 641, 648, 104 S.Ct. 3262, 3266, 82 L.Ed.2d 487 (1984) (citations omitted); *see also Hague v. CIO,* 307 U.S. 496, 515–16, 59 S.Ct. 954, 963–64, 83 L.Ed. 1423 (1939) ("The privilege ... to use the streets and parks for communication of views on national questions may be regulated in the interest of all ... but it must not, in the guise of regulation, be abridged or denied."); *White House Vigil for the ERA Comm. v. Clark,* 746 F.2d 1518, 1526 (D.C.Cir.1984) ("Certain types of places are so vital to a healthy and robust public discourse that they are accorded special status under the first amendment.... The public sidewalk here is one such forum."). At the time he was arrested Lyons had a right to express his political views from the sidewalks of Lewiston, subject to restrictions that were content neutral, narrowly tailored to meet a significant governmental interest, and allowed for ample alternate channels for communication.

Whether Lyons's rights were violated depends on the resolution of several factual disputes. The record suggests that the "demonstrator area" may have been created for ACT–UP exclusively, that other members of the public, including other demonstrators, may have been allowed to proceed toward the motorcade viewing area, and that the "demonstrator area" may have been unreasonably and unnecessarily distant and isolated from the high school and the motorcade viewing area. The court properly found, therefore, that there are genuine issues of material fact whether the restriction here

was content-neutral or targeted against the ACT–UP message, whether the restriction was narrowly tailored, and whether it left open sufficient alternate channels of communication. In short, as the court found, Lyons's constitutional rights to free speech and assembly may well have been violated, and the defendants did not meet their burden pursuant to the first prong of the test articulated in *Creamer.*

Nor have the defendants satisfied the second part of our test. Given the state of the law, as set forth above, reasonable public officials would have known that restrictions on Lyons's expressive activity had to be content neutral, narrowly tailored, and allow for ample alternate channels of communication.[4] *Regan,* 468 U.S. at 648, 104 S.Ct. at 3266; *White House Vigil for the ERA Comm.,* 746 F.2d at 1526–27; *United States v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673, 1678, 20 L.Ed.2d 672 (1968). A reasonable officer would certainly have known he was violating a clearly established right by establishing and enforcing an isolated "demonstrator area" exclusively for one group. The issue cannot be resolved, however, without further development of the underlying facts. The trial court did not err, therefore, in concluding that the defendants failed to establish the second prong of the test for a qualified immunity.

 We turn next to the question whether the municipal defendants are entitled to immunity as a matter of law. Governmental entities are liable for violations of constitutional rights if they establish a policy that violates the Constitution and that policy is the cause of and moving force behind the claimed constitutional deprivation. *Monell v. Department of Social Servs.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978). The municipal policy may consist of a single edict or act by a municipal official. *Pembaur v. Cincinnati,* 475 U.S. 469, 481, 106 S.Ct. 1292, 1298, 89 L.Ed.2d 452 (1986). Additionally, municipalities may be held liable pursuant to section 1983 for violations of

---

4. Indeed, the record suggests that the Lewiston Chief of Police was aware that restrictions of First Amendment rights are subject to scrutiny. In his answers to interrogatories, he explained that the location of the "demonstrator area" was determined after he expressed the concern that other recommended sites "would be even more restrictive."

federal constitutional rights if constitutional violations result from the municipality's failure to train its employees concerning those rights, and its failure to train reflects an indifference by the municipality to the constitutional rights of its citizens. *City of Canton v. Harris*, 489 U.S. 378, 388, 109 S.Ct. 1197, 1204, 103 L.Ed.2d 412 (1989).

The record suggests that the Lewiston Police Chief shared responsibility for determining the location of the "demonstrator area." The record also suggests that city and county officials participated in actually establishing and enforcing the area. Finally, the record suggests that the municipal defendants may not have trained their officers concerning First Amendment rights and that the failure to train may reflect indifference by municipal defendants to those rights. The court therefore did not err in denying a summary judgment in favor of the municipal defendants based on their defense of qualified immunity. Similarly, the court did not err in denying Lyons's motion for a partial summary judgment because there are genuine issues of material fact with respect to the defendants' defense of qualified immunity.

### III.

We next consider whether the court erred in granting a summary judgment in favor of the defendants on Lyons's state tort claims. The Maine Tort Claims Act ("MTCA") grants governmental employees "absolute immunity from personal civil liability for performing discretionary functions." *Moore v. City of Lewiston*, 596 A.2d 612, 615 (Me.1991); *see* 14 M.R.S.A. § 8111(1)(C), (E)

(Supp.1994),[5] as long as the contested action is "essential to the realization or accomplishment of a basic governmental policy, program or objective." *Creamer*, 652 A.2d at 114 (quoting *Miller v. Szelenyi*, 546 A.2d 1013, 1021 (Me.1988).) Discretionary immunity applies unless the defendants' conduct "clearly exceeded, as a matter of law, the *scope* of any discretion [they] could have possessed in [their] official capacity as [police officers]." *Polley v. Atwell*, 581 A.2d 410, 414 (Me.1990) (emphasis in original); *see also Darling v. Augusta Mental Health Inst.*, 535 A.2d 421, 425 (Me.1987) (immunity applies only to government employees whose conduct is "within the scope of their employment"); *cf. Maguire*, 783 F.Supp. at 1477, 1478 (police officer's act of threatening plaintiff with night stick and future harm if plaintiff protested about the towing of his car exceeded conduct given immunity by section 8111). Regulating the demonstration and protecting the President are unquestionably discretionary functions of the governmental employees involved.

The only limitation on immunity for an intentional act or omission under the MTCA is that it must not be the result of "bad faith." 14 M.R.S.A. § 8111(1)(E). In his deposition, Lyons stated that Jones asked him if he was part of "the gay group," and that police officers were wearing plastic gloves. Lyons also contends that the "demonstrator area" was established to contain the ACT–UP group because they were "a gay rights group." Lyons's presentation is insufficient to raise a genuine issue of material fact with respect to whether the defen-

---

5. The MTCA provides in part:
 Notwithstanding any liability that may have existed at common law, employees of governmental entities shall be absolutely immune from personal civil liability for the following:
 . . .
 C. Performing or failing to perform any discretionary function or duty, whether or not the discretion is abused; and whether or not any statute, charter, ordinance, order, resolution, rule or resolve under which the discretionary function or duty is performed is valid; . . .
 E. Any intentional act or omission within the course and scope of employment; provided that such immunity shall not exist in any case in which an employee's actions are found to have been in bad faith.

The absolute immunity provided by paragraph C shall be applicable whenever a discretionary act is reasonably encompassed by the duties of the governmental employee in question, regardless of whether the exercise of discretion is specifically authorized . . . and shall be available to all governmental employees, including police officers . . . who are required to exercise judgment or discretion in performing their official duties.

14 M.R.S.A. § 8111(1)(C), (E) (Supp.1994). For activities not immune under section 8111, the MTCA establishes "broad liability" on the part of the employee. *Moore*, 596 A.2d at 615; *see* 14 M.R.S.A. § 8102(2–A) (Supp.1994).

dants were acting in "bad faith." The court therefore did not err in granting a summary judgment in favor of the defendants on these claims.

## IV.

Finally, we consider whether the court erred in granting a summary judgment in favor of the municipal defendants on Lyons's claim for punitive damages under section 1983 and reserving its ruling concerning Lyons's claim for punitives against the individual defendants. A municipality is immune from punitive damages in a section 1983 action. *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271, 101 S.Ct. 2748, 2761, 69 L.Ed.2d 616 (1981). Therefore, the trial court did not err in granting a summary judgment in favor of the City of Lewiston and the County of Androscoggin. Punitive damages are available in a section 1983 action against an individual "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983). The court reserved a ruling on this claim. Although, as noted above, the conduct of the individual defendants did not raise a genuine issue of material fact as to whether they were acting in "bad faith," it may evidence a "reckless or callous indifference to" the plaintiff's "federally protected rights." *Id.* The court did not err therefore in not granting a summary judgment in favor of the defendants on this issue.

The entry is:

Judgment affirmed.

ROBERTS, GLASSMAN and LIPEZ, JJ., concurring.

WATHEN, Chief Justice, with whom CLIFFORD and RUDMAN, Justices, join, dissenting.

I must respectfully dissent. The Court concludes as a matter of law that there is no genuine issue of fact that defendant police officers acted in bad faith or exceeded the scope of their discretion for purposes of immunity under the Maine Tort Claims Act. I agree and suggest that it is illogical to come to a different conclusion, on the same record, in assessing the legal reasonableness of the officers' conduct for purposes of determining qualified immunity to a section 1983 claim. Although there are limits to the defense that "I was only following orders," in my view the Court fails to give appropriate consideration to the fact that the officers were carrying out the directive of those Secret Service Agents who were charged with protecting the President of the United States. Given the existence of those orders, the actions of the local police officers are objectively reasonable, and thus, section 1983 immunity should be afforded.

The record reveals that the "demonstrator area" was established by the Secret Service Agents. The following account, provided by the affidavit of a captain in the Lewiston Police Department, is unchallenged:

[A] Secret Service Agent in charge of advance intelligence, reported at these meetings that he had received information that members of the Maine Chapter of Act–Up were planning a demonstration in Lewiston during the President's visit. He informed the individuals present that Act–Up was a radical ·AIDS activist group known for their disruptive tactics. He explained that these tactics included throwing used condoms and blood, biting and spitting at police officers, laying down, en masse, in a roadway blocking traffic (known as a "die-in"), seeking out weaknesses in security in order to penetrate safety zones, and generally utilizing other similar tactics so as to create confusion and disruption at civic event. He further indicated that approximately 1,500 members of Act–Up had recently staged a demonstration in Kennebunkport. It was unknown at the time how many of these demonstrators had remained behind to participate in the Lewiston rally....

[The Agent] also received intelligence that an undetermined number of Bates College students also planned to demonstrate on the day of the President's visit....

Based on this intelligence the Secret Service established a specific area where dem-

onstrators would be allowed to congregate and protest. . . .

Although there may be a genuine issue of fact whether the chief of the Lewiston Police Department was instrumental in determining the precise location of the demonstration area, that fact is not relevant and there can be no doubt that the existence and operation of the area was dictated expressly by the Secret Service.

Faced with the competing demands of presidential security and the First Amendment rights of the protestors, a reasonable police officer would not realize that the Secret Service order establishing a demonstration area would violate plaintiff's clearly established rights. The "objective reasonableness" standard is "comparatively generous to the police in cases where potential danger, emergency conditions or other exigent circumstances are present" and the Supreme Court "intends to surround the police who make these on-the-spot choices in dangerous situations with a fairly wide zone of protection in close cases." *Roy v. City of Lewiston,* 42 F.3d 691, 696 (1st Cir.1994).

I would grant summary judgment in favor of the defendants on plaintiff's section 1983 claim on the basis of qualified immunity.